UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| DARLA D. (BEASLEY) ELKINS, | ) | |
| (Social Security No. XXX-XX-2287), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:10-cv-74-WGH-RLY |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 7, 9) and an Order of Reference entered by Chief District Judge Richard L. Young on September 21, 2010 (Docket No. 12).

## I. Statement of the Case

Plaintiff, Darla D. (Beasley) Elkins, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. § 404.1520(g). The court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB and SSI on February 11, 2004, alleging disability since October 17, 2003. (R. 94-96). The agency denied Plaintiff's application both initially and on reconsideration. (R. 73-80). Plaintiff appeared and testified at a hearing before Administrative Law Judge Jay Levine ("ALJ") on July 31, 2006. (R. 330-65). Plaintiff was represented by an attorney; also testifying was a vocational expert ("VE"). (R. 330). On October 23, 2006, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 57-65). After Plaintiff filed a request for review, the Appeals Council remanded the case for further consideration by the ALJ; the Appeals Council noted that the ALJ had found that Plaintiff's RFC included a sit-stand option, but there was no determination of the frequency of the option nor was the proper hypothetical question asked to the VE. (R. 90-91). The Appeals Council explicitly instructed the ALJ to specify how frequently Plaintiff would need to alternate between sitting and standing and then solicit testimony from the VE about the effect on the number of jobs available to Plaintiff. (R. 90).

On remand, the new ALJ, Reinhardt Korte, conducted a hearing on September 24, 2007. (R. 366-418). Plaintiff was represented by an attorney; also testifying was a VE and two medical experts. (R. 366). On November 16, 2007, the ALJ issued his opinion (18-25); the ALJ disregarded the instruction of the Appeals Council and instead found that Plaintiff was not disabled because she did not suffer from any severe impairment at step two and, therefore, was

not under a disability. (R. 25). The Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 3-5). Plaintiff then filed a Complaint on May 20, 2008, seeking judicial review of the ALJ's decision. On April 24, 2009, this Magistrate Judge remanded Plaintiff's claim "for further analysis at steps three, four, and, if necessary, five of the five-step sequential evaluation process required by the Social Security regulations." (R. 486U).[1]

After the second remand, ALJ Korte, conducted a new hearing on October 21, 2009. (R. 769-95). Plaintiff was represented by an attorney but chose not to attend the hearing because of a funeral (R. 771); also testifying was a VE and three medical experts (R. 769).[2] On January 21, 2010, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the RFC to perform a significant number of jobs in the regional economy. (R. 457-67). The Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 436-38). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on July 16, 2010, seeking judicial review of the ALJ's decision.

---

[1]Before Plaintiff's claim was remanded, Plaintiff filed new applications for DIB and SSI on May 21, 2008, claiming the same October 17, 2003 alleged onset date. (R. 513-15, 585). The Appeals Council consolidated these new applications with the remanded claim and ordered an ALJ to issue a new decision on the consolidated claims. (R. 507-10).

[2]While Plaintiff did not attend the hearing, the ALJ took judicial notice of Plaintiff's testimony from the two prior hearings and also received into evidence a statement (R. 469-70) submitted by Plaintiff. (R. 457).

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 42 years old at the time of the ALJ's decision and had at least a high school education.  (R. 466).  Her past relevant work experience included work as a certified nursing assistant (medium, unskilled), a short order cook (light, semi-skilled), a warehouse order puller (medium, unskilled), and a manufacturer's representative (light, skilled).  (R. 63).

### B.  Medical Evidence

#### 1.  Plaintiff's Impairments

On October 17, 2003, Plaintiff suffered injuries resulting from an automobile accident.  (R. 158).  Plaintiff was in a head-on collision at 60 miles per hour and suffered a loss of consciousness and head trauma.  (R. 158).  Plaintiff was seen in the emergency room at the University of Louisville Hospital by Royce Coleman, M.D.  (R. 160-61).  Plaintiff complained of right hip tenderness and lumbar spine tenderness, and she suffered an abrasion to her anterior chest.  (R. 160).  X-rays showed mild rotation with questionable widening of Plaintiff's sacroiliac joint on the left, but otherwise showed normal results.  (R. 161).  A CT scan of Plaintiff's cervical spine showed degenerative changes at C5-6 and slight rotation.  (R. 163).  A CT scan of Plaintiff's pelvis showed a right lower lateral minimally displaced rib fracture.  (R. 165).  Plaintiff also suffered loss of normal lordosis, but no fracture or subluxation.  (R. 171).

Plaintiff's primary treating physician is David R. Baker, M.D. At a visit to his office on October 24, 2003, a week after Plaintiff's accident, it was noted that Plaintiff complained of pressure in her right ear and the right side of her face felt numb. (R. 274). She stated that she saw silver streaks when she laid down, but felt better if she laid down, and she was often dizzy. (R. 274). The diagnosis was paresthesia of the face and vertigo. A week later, Plaintiff went for a follow-up visit with Dr. Baker and reported that her dizziness was getting better when she wore her cervical collar, but if she stood for too long she would get dizzy and feel like she was going to pass out. (R. 275). She also complained of spasms in her neck and back. (R. 275).

Plaintiff began physical therapy at Progressive Physical Therapy on November 5, 2003. (R. 181). At this time, she was experiencing headaches, muscular pain at rest, difficulty sleeping, constant pain unrelieved by rest or movement, shortness of breath, dizziness, balance problems, unusual fatigue and weakness, tingling, numbness, loss of feeling, pain with coughing or sneezing, and changes in bowel and bladder habits. (R. 186). Plaintiff started physical therapy for two weeks, three times a week. (R. 187). Treatment included neck range of motion exercises for strengthening her neck, increasing neck strength, increasing range of motion, and decreasing pain. (R. 187).

Plaintiff continued physical therapy on February 3, 2004. (R. 194). It was noted that she had met all of her short-term goals and four of five long-term goals. (R. 194). Plaintiff did report that she continued to have some weakness

and was "shaky." (R. 195). On March 1, 2004, it was noted that Plaintiff had demonstrated improvement in strength and exercise tolerance. (R. 191).

On February 4, 2004, Plaintiff was seen by Dr. Baker. (R. 270). She reported that she felt really weak on her right side. She demonstrated pain on palpation of her lumbar spine. (R. 270). Plaintiff also complained of depression. (R. 270).

Ralph M. Buschbacher, M.D., performed an independent medical examination on April 30, 2004. (R. 276-80). The exam revealed that Plaintiff walked with a very slow, antalgic gait and has quite a lot of pain behavior. (R. 279). Plaintiff had moderately decreased back range of motion in all directions. (R. 279). Dr. Buschbacher also stated that Plaintiff reported right upper extremity and right lower extremity pain with possibly a radiculopathy. (R. 280). He opined that any problems in these areas should be addressed with physical therapy. (R. 280). Dr. Buschbacher opined that Plaintiff had a post concussive syndrome, and he would recommend an MRI of the brain as well as a neuropsychological evaluation. (R. 279). Dr. Buschbacher also reported that this appeared to be causing Plaintiff some stress and anxiety which has caused a behavioral component to her symptoms. (R. 279). He recommended between two and five neuropsychology treatments and between five to ten therapy sessions working with a psychologist on muscle relaxation and to teach her how to deal with her mental problems in a more constructive manner. (R. 280). Dr. Buschbacher reported that he thought all of Plaintiff's current symptoms were

directly related to her motor vehicle accident, and she was not yet at maximum medical improvement. (R. 280).

Plaintiff also underwent a consultative exam by clinical psychologist, Richard Karkut, Psy.D., on August 17, 2004. (R. 281-85). Plaintiff reported being depressed by her medical and financial problems, and that her symptoms contribute to her tendency not to change her clothes regularly or engage in recreational activities as frequently. (R. 284). Dr. Karkut noted that, although Plaintiff suffered a head injury in her accident, her WMS-III scores reveal no significant memory impairment, and she has no signs of post-traumatic stress disorder. (R. 285). Dr. Karkut diagnosed Plaintiff with major depressive disorder, single episode, mild. (R. 284). Plaintiff had a GAF score of 65. (R. 285).

On April 20, 2005, Plaintiff returned to Dr. Baker after an absence of a year. (R. 311). She reported that everything made her nervous, and she could not work due to fatigue and anxiety. (R. 311). Dr. Baker renewed Plaintiff's medications and advised counseling. (R. 311). On May 18, 2005, Plaintiff reported increased dizziness but decreased headaches. (R. 310). Things were "getting better." (R. 310).

On April 17, 2006, Plaintiff returned to Dr. Baker and complained of stiffness, back pain, and dizziness when she stood up. (R. 307). Dr. Baker prescribed medication and, on May 3, 2006, Plaintiff reported that her pain was "better." (R. 307). On May 5, 2006, Dr. Baker diagnosed restless leg syndrome

after Plaintiff reported increased "leg jerks." (R. 306). Later, on May 19, 2006, Plaintiff reported that she was sleeping a lot better after she started taking her medication. (R. 305, 434). Plaintiff reported that her pain was "tolerable." (R. 305).

On May 12, 2006, Plaintiff saw Karl W. Evans, Psy.D., at the request of Dr. Baker. (R. 320-22). Plaintiff reported left buttock pain radiating into her left leg. (R. 320). She also reported numbness and difficulties with falling. (R. 320). She also complained of left side neck pain. (R. 320). Plaintiff reported that she cared for her son, who had cerebral palsy, every other weekend. (R. 321). She reported a moderate activity level; she ran errands, watched her niece, cared for her dog, and did housework. (R. 320). Dr. Evans opined that Plaintiff's past history of sexual and physical abuse "likely made her vulnerable to developing anxiety after her motor vehicle accident," and he recommended continued medication and psychological intervention for her past abuse and her chronic pain. (R. 322).

On June 15, 2006, Plaintiff reported to Dr. Baker that, concerning her back pain, she had good days and bad days. (R. 305). Also, Plaintiff complained of right ankle pain and instability. (R. 304). On examination, she had full right ankle range of motion. (R. 304).

On September 27, 2006, Plaintiff complained to Dr. Baker of feeling stressed and having difficulty sleeping. (R. 433). She had not been taking her medications because she ran out of them. (R. 433). In October 2006, Plaintiff

reported that her headaches were improved since she had been taking her medication. (R. 432). Dr. Baker noted that Plaintiff was "mild[ly] depressed," but had an appropriate affect. (R. 432). Her back was tender. (R. 432).

In May 2007, Plaintiff returned to Dr. Baker with complaints of difficulty sleeping due to leg cramps. (R. 431). In June 2007, Plaintiff reported that her medication helped, but she was still waking up two or three times a night with her legs kicking and moving. (R. 431).

In July 2007, Plaintiff reported difficulty with her 18-year-old son, resulting in her feeling stressed out. (R. 430). Plaintiff complained of right shoulder pain, defective fourth finger, low back aches, and right foot drop. (R. 430). Plaintiff displayed a slight limp in her gait; weakness in her right arm, shoulder, and leg; a decreased range of motion in her right shoulder; and tenderness in her back at the SI joint. (R. 430).

In August 2007, Plaintiff reported improvement with sleep and anxiety with medication. (R. 429). She still had some crying spells. (R. 429). She reported having flashbacks of her auto accident. Additionally, she had tenderness in her SI joint, a limp, and a foot drop on her right side. (R. 429).

Dr. Baker completed a RFC form on August 30, 2007, and stated that the Plaintiff had agoraphobia related to a post-traumatic stress disorder as a result of her motor vehicle accident. (R. 420-25). Dr. Baker elaborated on Plaintiff's mental impairments and stated that she experiences limitations in the following: poor memory; general depression; feelings of guilt/worthlessness; difficulty

concentrating/thinking; intrusive recollections of a traumatic experience; generalized persistent anxiety; pathological dependence or passivity; sleep disturbance; mood disturbance; loss of intellectual functioning; social withdrawal or isolation; decreased energy; and recurrent panic attacks. (R. 423-24). His reasoning for these limitations stemmed from Plaintiff's post-traumatic stress disorder, insomnia, anxiety with panic attacks, and depression. (R. 424). He stated that she does not deal with stress well, gets flustered, and is forgetful. (R. 424). Based on Plaintiff's mental impairments alone, Dr. Baker stated that Plaintiff would be absent from work much more than twice a month and episodically for a few days each time. (R. 424). In terms of Plaintiff's physical impairments, Dr. Baker's RFC form stated that Plaintiff could carry less than five pounds due to right upper extremity weakness and discoordination due to her motor vehicle accident. (R. 420). He also opined that she could walk "very little—much less than 2 hours" as she "fatigues easily due to insomnia, [and] discoordination of [her] right lower extremity." (R. 421). In addition, she could sit for less than two hours due to low back pain, right sacroiliac pain, and chronic inflammation. (R. 421). He further elaborated that her maximum sitting time is 15 minutes, and she must be able to sit or stand at will. (R. 421). He stated that this was observed in his office. (R. 421). Dr. Baker also stated that Plaintiff appeared poorly coordinated, lacked good hand-eye coordination or good finger dexterity, had significant ambulation difficulties, had significant exertional pain, and became fatigued with exertion

and would need unscheduled breaks more often than every two hours.  (R. 423).

These difficulties were due to Plaintiff's sacroiliitis with sciatic pain on the right

side, right hand contractures, and right leg with discoordination and foot drop.

(R. 423).

In September 2007, Plaintiff reported a recent fall.  (R. 428).  Dr. Baker

administered an injection.  (R. 428).  Dr. Baker diagnosed sacroiliitis.  (R. 427).

Plaintiff later reported that she felt "numb" at the waist, and Dr. Baker noted

that it was "unusual" for an injection to cause numbness in the back, waist, and

leg, when it was given in the hip area.  (R. 428).  Dr. Baker administered another

injection.  (R. 427). Plaintiff displayed a tender SI joint, a limp, and weakness in

her right extremities.  (R. 427).

On September 28, 2008, Plaintiff underwent a consultative physical

examination at Greenwood Pediatrics and Internal Medicine.  (R. 610-13).

Plaintiff displayed a reduced range of motion in the lumbar spine and right

shoulder.  (R. 613).  Plaintiff was noted to walk with a mild limp, but ambulated

with no assistive device.  (R. 611).  She held her right hand in a contractured

flexion position, but was able to extend her hand when asked.  Her right foot was

internally rotated.  The right shoulder and right sacroiliac joint were tender.  (R.

611).  Tenderness bilaterally in the lumbar paraspinal muscle was noted.  (R.

612).  Muscle strength and grip strength were essentially normal.  Straight leg

raising was limited to 20 degrees on the right side.  Fine finger manipulation was

moderately impaired.  Plaintiff was noted to be unable to squat, or to walk or

stand on her right heel or toes.  (R. 612).  Impressions included history of a motor vehicle accident with right shoulder injury, right hip injury, and head injury; right back pain; frequent falls; restless leg syndrome; depression; and anxiety.  (R. 612).

On September 16, 2009, Dr. Baker completed a note reaffirming his RFC assessment from August 2007.  (R. 751-52).  Dr. Baker reported that Plaintiff had significant non-exertional pain, but that he had been relatively successful in managing Plaintiff's pain symptoms without the extended use of narcotic pain medication.  (R. 751).  Dr. Baker also added that Plaintiff would have extensive absences, much more than twice a month and much more than two days at a time.  (R. 752).

### 2.  State Agency Review

On September 9, 2004, state agency psychologist K. Neville, Ph.D., completed a Psychiatric Review Technique form.  (R. 289-301).  Dr. Neville considered Listing 12.04 for affective disorders and concluded that Plaintiff did not suffer from a severe impairment.  (R. 289).  Plaintiff had a medically determinable impairment present that does not precisely satisfy the affective disorders criteria.  (R. 292).  The review revealed that Plaintiff has mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  (R. 299).

On July 16, 2008, state agency psychologist, William A. Shipley, Ph.D., completed a Psychiatric Review Technique form. (R. 614-27). Dr. Shipley concluded that Plaintiff did not have a medically-determinable mental impairment. (R. 614). His conclusion was based in part on Plaintiff's treatment for emotional problems by her primary care physician. He found her complaints credible, but he stated that "[s]he does not suffer from a significantly limiting mental condition." (R. 626).

On August 6, 2008, a state agency physician, J. Sands, M.D., completed a Physical Residual Functional Capacity Assessment form. (R. 601-08). Dr. Sands found that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; she could sit, stand, and walk six hours each in an eight-hour workday; she had no postural limitations; and she could only occasionally reach overhead, handle, and finger. (R. 602-04). M. Brill, M.D., affirmed Dr. Sands' assessment. (R. 600).

### 3. Testimony of Medical Experts at Plaintiff's Administrative Hearings

Dr. Georgiann Pitcher and Dr. Julian Freeman testified at Plaintiff's September 24, 2007 hearing. (R. 366). Dr. Pitcher testified that she did not see any mental health outpatient treatment in Plaintiff's past medical history. (R. 403). Dr. Pitcher testified that Plaintiff did undergo a mental status exam in 2004. (R. 403). At that time, Plaintiff was diagnosed with major depressive disorder which was related to her physical pain. (R. 404). Dr. Pitcher also testified that Plaintiff saw Dr. Evans in July 2007, and he recommended

psychiatric or psychological treatment to help her deal with pain. (R. 404). Dr. Pitcher testified that Dr. Baker had completed a mental and emotional limitations questionnaire regarding Plaintiff after her accident. (R. 405). On the questionnaire, Dr. Baker indicated that Plaintiff had significant difficulty with work-related activities, difficulty maintaining attention for more than a two-hour period, difficulty maintaining work attendance, difficulty sustaining an ordinary work routine and completing a normal workday, and difficulty accepting instructions and responding appropriately. (R. 405). Dr. Pitcher testified that she was not refuting Dr. Baker's claims, even though they were not supported with psychological tests. (R. 405). Dr. Pitcher testified that Plaintiff's depression most likely came from the inability to physically be able to do a lot of the activities she used to partake in. (R. 406). Dr. Pitcher stated that the depression mildly affected Plaintiff's activities of daily life and social relationships, and the depression did not seem to greatly affect her concentration and attention. (R. 406).

Dr. Freeman questioned whether there was a clear statement or clinical examination by a physician describing the foot drop or the problems with the right hand that were described in Plaintiff's testimony. (R. 409). Plaintiff's attorney explained that the functional impairment form that Dr. Baker filled out was completed in connection with an examination in which he described the foot drop and hand problem. (R. 409-10). Dr. Freeman testified that there was no evidence of any persistent physical impairment in the record and there were no

clinical examination findings that would support the presence of a physical problem causing her symptoms. (R. 410). Dr. Freeman also testified that it was possible that Plaintiff has a significant neurological problem affecting her foot and leg and a contracture involving the hand. (R. 411). Dr. Freeman stated that since the clinical examine was normal, the circumstances would favor a somatoform disorder. (R. 411). Dr. Freeman testified that Plaintiff did not seem to present a medically determinable physical impairment. (R. 411).

Richard Hutson, M.D., an orthopedist, testified at the October 21, 2009 hearing. (R. 773-78). Dr. Hutson opined that, from an orthopedic surgery standpoint, Plaintiff had essentially recovered from her injuries in the motor vehicle accident of 2003 within less than twelve months; he found nothing in the record from an orthopedic surgery standpoint that would be totally disabling. (R. 773). Dr. Hutson acknowledged that evidence from the most recent consultative physical examination would support a restriction of no function with the right elbow above shoulder level. (R. 775). Dr. Hutson reviewed Dr. Baker's September 2009 functional assessment and testified that the assessment did not cause him to rethink his earlier-stated opinions. (R. 775-77).

Lloyd Stump, M.D., an internist, testified at the October 21, 2009 hearing that there appeared to be very little information in the file relevant to his medical field. (R. 778-81). Plaintiff's most significant treatment was for hypertension and hypothyroidism. Plaintiff had also, at one time, self-medicated with alcohol

to help her sleep.  (R. 778).  Dr. Stump testified that he reviewed Dr. Baker's RFC findings and did not find any internal medicine diagnoses to support these findings contained in Dr. Baker's most recent functional assessment.  (R. 780).

Jack Thomas, Ph.D., also testified at Plaintiff's October 2009 hearing.  (R. 781-85).  He opined that the only formal psychological evidence in the record was limited to an August 2004 exam by Dr. Karkut and a May 2006 psychological pain evaluation by Dr. Evans.  (R. 781-82).  Dr. Thomas reviewed the evidence dealing with psychological impairments and concluded that "the issue is largely, I think, pain with some mild depression and that's, that's what we have."  (R. 784).  Dr. Thomas testified that he agreed with Dr. Pitcher's ratings of the "B" criteria (for Listings 12.04 and 12.06) at the earlier hearing, of mild restriction of daily living activity, mild restriction of social functioning, mild restriction of concentration, persistence, or pace; and no episodes of decompensation.  (R. 784).  Dr. Thomas also reviewed Dr. Baker's September 2009 assessment and acknowledged that the restrictions he assessed were less severe than those of Dr. Baker.  (R. 785).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes

that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant

numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date and that Plaintiff was insured for DIB through December 31, 2009. (R. 459). The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had three impairments that are classified as severe: degenerative disc disease of the cervical spine; a right shoulder impairment; and generalized weakness. (R. 459). The ALJ concluded that none of these impairments met or substantially equaled any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 461). The ALJ determined that Plaintiff was only "partially credible." (R. 465). The ALJ then found that Plaintiff retained the RFC for light work except she could not use her right arm for work activities above shoulder level. (R. 462). The ALJ determined that, based on this RFC, Plaintiff could not perform her past work. (R. 465). However, the ALJ determined that there were a substantial number of jobs in the economy that Plaintiff could still perform. (R. 466). The ALJ, therefore, concluded that Plaintiff was not under a disability. (R. 467).

# VI.  Issues

Plaintiff has raised four issues.  The issues are as follows:

1.  Whether the ALJ erred by failing to find several of Plaintiff's impairments to be severe.

2.  Whether Plaintiff's mental impairment met Listing 12.04.

3.  Whether Dr. Baker's opinions are entitled to controlling weight.

4.  Whether the ALJ's credibility determination is patently wrong.

**Issue 1:**     **Whether the ALJ erred by failing to find several of Plaintiff's impairments to be severe.**

Plaintiff's first argument is that the ALJ should have found that her mental impairments, foot drop, trigger finger, dizziness, headaches, and back problems were severe impairments at step two of the five-step sequential evaluation process.  There was nothing improper about the ALJ's decision at step two.  As then U.S. District Judge (now Circuit Judge) David Hamilton has indicated, "[a]s long as the ALJ proceeds beyond step two, as in this case, no reversible error could result solely from his failure to label a single impairment as 'severe.'  The ALJ's classification of an impairment as 'severe' or 'not severe' is largely irrelevant past step two.  What matters is that the ALJ considers the impact of all of the claimant's impairments–'severe' and 'not severe'–on her ability to work."  *Gordon v. Astrue,* 2007 WL 4150328 at *7 (S.D. Ind. 2007).  In this case, the ALJ proceeded beyond step two and analyzed the effects of the combination of Plaintiff's impairments on her RFC.  Therefore, the ALJ's failure to label these impairments as severe was not an error requiring remand.

**Issue 2:     Whether Plaintiff's mental impairment met Listing 12.04.**

Plaintiff also argues that the ALJ committed error by not concluding that Plaintiff's mental impairments met Listing 12.04.  In order to meet Listing 12.04, an individual must either meet the requirements of subsections A and B or the requirements of subsection C of Listing 12.04.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04.  In this case, Plaintiff does not argue that the C criteria are met.  Therefore, Plaintiff must demonstrate that Plaintiff's mental impairment is severe enough that it meets the B criteria of Listing 12.04.  Specifically, Plaintiff must demonstrate:

> B.  . . . at least two of the following:
>
> 1.  Marked restriction of activities of daily living; or
>
> 2.  Marked difficulties in maintaining social functioning; or
>
> 3.  Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4.  Repeated episodes of decompensation, each of extended duration; . . . .

*Id.*

In this case, Plaintiff alleges that her statements, as well as the opinions of her treating physician, Dr. Baker, demonstrate that she met the B criteria of Listing 12.04.  However, Dr. Baker never conducted any psychological examinations of Plaintiff.  Additionally, when Dr. Karkut conducted a mental status exam, he assigned Plaintiff a GAF score of 65 which indicated only mild symptoms.  (R. 285).  Furthermore, three other doctors examined the record and

concluded that Plaintiff only suffered from mild restrictions. Dr. Neville, Ph.D., considered Listing 12.04 and concluded that Plaintiff did not suffer from any severe mental impairment; Dr. Neville concluded that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (R. 289, 299). At Plaintiff's September 2007 hearing, Dr. Pitcher found similar mild limitations. (R. 406). At Plaintiff's October 2009 hearing, Dr. Thomas testified that he agreed with Dr. Pitcher's assessment. (R. 784). Based on the lack of psychological testing by Dr. Baker to support any findings of "marked" limitations as well as the fact that at least four psychological experts concluded that Plaintiff only had mild limitations, the court concludes that the ALJ's decision is supported by substantial evidence.

**Issue 3:      Whether Dr. Baker's opinions are entitled to controlling weight.**

Plaintiff also finds fault in the ALJ's treatment of Dr. Baker's opinions. Opinions of a treating physician are generally entitled to controlling weight. *Clifford v. Apfel,* 227 F.3d at 870. However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001). Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

(d)  How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2)  Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  Length of the treatment relationship and the frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the

source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3)  Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)  Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5)  Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)  Other factors.  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors

that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527.

In this instance, Dr. Baker completed an RFC form on August 30, 2007, in which he found extremely severe limitations. (R. 420-25). He reaffirmed these limitations in a letter dated September 16, 2009. (R. 751-52). However, Dr. Baker's extreme findings are inconsistent with numerous other medical opinions and evidence in the record. For instance, Dr. Karkut's August 2004 mental status exam revealed mild restrictions due to mental impairments. (R. 281-85). Dr. Karkut found no memory problems which were directly in conflict with Dr. Baker's findings of memory problems. (R. 285). Additionally, Plaintiff underwent a September 2008 consultative physical examination. (R. 610-13). Plaintiff's muscle strength and grip strength were essentially normal, which greatly contradicted Dr. Baker's opinions that extreme weakness causes Plaintiff to be unable to lift more than five pounds or stand/walk for more than two hours. (R. 612). Furthermore, a total of four state agency doctors have examined Plaintiff's claim and concluded that her impairments are not as severe as Dr. Baker opined. Two psychologists examined Plaintiff's claims of severe mental impairments and concluded that Plaintiff's mental impairments were not even severe for the purposes of step two of the five-step sequential evaluation process. (R. 289-301, 614-27). Two doctors also examined Plaintiff's physical limitations and concluded that Plaintiff had much more modest limitations than those found by Dr. Baker. (R. 600-08). Finally, a total of five doctors testified

at Plaintiff's two most recent hearings that Plaintiff's impairments were not nearly as severe as Dr. Baker suggested. Dr. Pitcher opined about Plaintiff's mental health and concluded that Plaintiff's activities of daily life, social functioning, and concentration were only mildly limited. (R. 406). Dr. Freeman testified that Plaintiff did not seem to present a medically determinable physical impairment. (R. 411). Dr. Hutson opined that there was nothing in the record from an orthopedic surgery standpoint that would be totally disabling. (R. 773). Dr. Hutson specifically indicated that he had reviewed Dr. Baker's September 2009 RFC assessment and testified that the assessment did not cause him to rethink his earlier-stated opinions. (R. 775-77). Dr. Stump testified that he reviewed Dr. Baker's RFC findings and did not find any internal medicine diagnoses to support Dr. Baker's opinions. (R. 780). Dr. Thomas testified that he believed Plaintiff had mild restriction of activities of daily living, mild restriction of social functioning, mild restriction of concentration, persistence, or pace; and no episodes of decompensation. (R. 784). In summary, at least 11 doctors examined Plaintiff's impairments and concluded that they were less severe than Dr. Baker had opined. We are reminded that we must not reweigh the evidence or substitute our opinion for that of the ALJ. *Clifford v. Apfel,* 227 F.3d at 869. Consequently, the ALJ's decision declining to grant controlling weight to Dr. Baker's opinions must be affirmed.

**Issue 4:    Whether the ALJ's credibility determination is patently wrong.**

Finally, Plaintiff argues that the ALJ conducted a flawed analysis of her credibility. An ALJ's credibility determination will not be overturned unless it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However, here, the ALJ's "credibility" decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain. Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's*

> *statements based on a consideration of the entire case record. This*
> *includes the medical signs and laboratory findings, the individual's*
> *own statements about the symptoms, any statements and other*
> *information provided by treating or examining physicians or*
> *psychologists and other persons about the symptoms and how they*
> *affect the individual, and any other relevant evidence in the case*
> *record.* This requirement for a finding on the credibility of the
> individual's statements about symptoms and their effects is reflected
> in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the
> regulations provide that an individual's symptoms, including pain,
> will be determined to diminish the individual's capacity for basic
> work activities to the extent that the individual's alleged functional
> limitations and restrictions due to symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence in the case record.

SSR 96-7p (emphasis added; footnote omitted). SSR 96-7p further provides that

the ALJ's decision regarding the claimant's credibility "must contain specific

reasons for the finding on credibility, supported by the evidence in the case

record, and must be sufficiently specific to make clear to the individual and to

any subsequent reviewers the weight the adjudicator gave to the individual's

statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's

subjective individual symptoms, such as pain, are considered, several factors are

relevant, including: (1) the individual's daily activities; (2) the location, duration,

frequency, and intensity of the individual's pain or other symptoms; (3) factors

that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness,

and side effects of any medication the individual takes or has taken to alleviate

pain or other symptoms; (5) treatment, other than medication, the individual

receives or has received for relief of pain or other symptoms; (6) any measures

other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

Here, the ALJ was presented with a unique situation in which the Plaintiff had two previous hearings in which she appeared and testified, but chose not to attend her most recent hearing. The ALJ took judicial notice of Plaintiff's testimony from the two prior hearings and also received into evidence a statement (R. 469-70) submitted by Plaintiff after her hearing. (R. 457). In the ALJ's decision, he concluded that Plaintiff's "allegations and testimony [were] partially credible." (R. 465). The ALJ credited Plaintiff's complaints of right shoulder pain and limited her to no lifting above her shoulder. (R. 465). However, the ALJ rejected the vast majority of Plaintiff's complaints of severely disabling conditions, including a back and hip that lock up, headaches, loss of balance, leg spasms, and emotional problems. While the ALJ's credibility determination was not perfect, we can trace the path of the ALJ's reasoning. The ALJ referenced the numerous medical opinions discussed above that found that Plaintiff's impairments were not nearly as severe as she alleged, including a consultative exam by Dr. Karkut, opinions from state agency physicians, and the opinions of the five medical experts who testified at Plaintiff's hearings. The ALJ also noted that Plaintiff "did not have a history of psychotherapy." (R. 461). The ALJ also noted that a consultative examiner, Dr. Buschbacher, was unable to

find a pathology for Plaintiff's symptoms, and there were "no orthopedic referrals or scans in the record." (R. 463-64). In summary, the ALJ determined that Plaintiff had undergone relatively conservative treatment, that the objective medical evidence did not support her allegations of extreme limitations, and that her complaints were unfounded. The record supports the ALJ's credibility determination. The ALJ's credibility determination was, therefore, certainly not patently wrong and it must be affirmed.

## VII. Conclusion

The ALJ did not err by finding that several of Plaintiff's impairments were not severe. Plaintiff's mental impairments did not meet Listing 12.04. Also, Dr. Baker's opinions were not entitled to controlling weight. Finally, the ALJ's credibility determination was not patently wrong. The decision of the Commissioner of the Social Security Administration is **AFFIRMED**.

**IT IS SO ORDERED.**

**Dated:** July 11, 2011

**Electronic copies to**:

Steven K. Robison
MONTGOMERY ELSNER & PARDIECK
srobison@meplegal.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov